UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
UNITED STATES OF AMERICA,

     -against-

SHAWNN MCFADDEN, also known as
"Un," DANIEL THOMPSON, ALLAH
BROWN and AHMAD JAMAL GERMANY,

     Defendants.
--------------------------------X

<u>MEMORANDUM AND ORDER</u>
13-CR-284(S-1)(DRH)

A P P E A R A N C E S:

For the Government:
    Kelly T. Currie
    Acting United States Attorney
    Federal Plaza
    Central Islip, New York 11722
     By: Charles P. Kelly, A.U.S.A.

For Defendant Shawnn McFadden:
    Michael L. Previto, Esq.
    156 Canal Road
    Coram, New York 11727

For Defendant Daniel Thompson:
    Naiburg, Obedin & Weissman, LLP
    The Courthouse Corporate Center
    Suite 4200
    320 Carlton Avenue
    Central Islip, New York 11722
     By: Glenn A. Obedin, Esq.

For Defendant Allah Brown:
    Frederick H. Cohn, Esq.
    245 A 7th Street
    Jersey City, New Jersey 07302

For the Defendant Ahmad Jamal Germany:
    Leonard Lato, Esq.
    200 Motor Parkway - Suite C-17
    Hauppauge, New York 11788

HURLEY, Senior District Judge

     Pending before the Court are a series of post-verdict

motions brought by defendants Shawnn McFadden ("McFadden"),
Daniel Thompson ("Thompson"), Allah Brown ("Brown") and Ahmad
Jamal Germany ("Germany")(collectively "defendants").

McFadden seeks a judgment of acquittal pursuant to Fed.
R. Crim. P. ("Rule") 29 as to the two counts of which he stands
convicted, Counts One and Four, or, alternatively, a new trial
under Rule 33(a) based on purported speedy trial violations and a
denial of his constitutional right to counsel.

Defendants Thompson, Brown and Germany have moved for
judgments of acquittal under Rule 29 with respect to Count One,
as well as the particular substantive mail fraud count of which
each stands convicted.

<u>BACKGROUND</u>

By superseding indictment filed on February 19, 2014,
defendants were charged with conspiracy to commit mail fraud
(Count One), and with four counts of substitutive mail fraud
(Counts Two through Five).  Specifically the grand jury charged:

> 5.  In or about and between March 2009 and
> July 2011, the defendants, . . . and others,
> engaged in a fraudulent scheme to obtain
> money from RepWest, Travelers, Allstate,
> GMAC, Progressive and GEICO for reimbursement
> of fraudulent no-fault and liability
> insurance claims.  To accomplish this scheme,
> the defendants MCFADDEN, COOKE, BROWN and
> GERMANY, together with others, caused
> fraudulent claims for medical treatment,
> medical supplies and personal injuries to be
> submitted to RepWest, Travelers, Allstate,
> GMAC, Progressive and GEICO in connection
> with motor vehicle accidents which were in

fact not accidents but were intentionally
caused by one or more of the defendants.
      6.  It was a part of the scheme that the
defendants SHAWNN MCFADDEN, also known as
"Un," DANIEL THOMPSON, ALLAH BROWN and AHMAD
JAMAL GERMANY and their co-conspirators
rented vehicles from U-Haul offices in Nassau
and Kings Counties that they thereafter drove
and/or rode in to various locations where
they either intentionally struck or were
intentionally struck by another vehicle
driven by a co-conspirator that resulted in
staged accidents . . . .

(Superseding Indictment, ¶s 5 and 6.)

      With respect to Counts Two through Five, the

substantive mail fraud charges, each listed sequentially one of

the four defendants as the "CLAIMANT," THE "CONTENTS OF [THE]

MAILING" as either a check for personal injury or a no fault

insurance application, as well as the addressee of the mailing.

(Id. at ¶ 16.)

      The case was tried before a jury beginning on January

20, 2015 and concluding on February 11, 2015.  Each defendant was

convicted of conspiracy to commit mail fraud as alleged under

Count One.  In addition, each was convicted of the singular mail

fraud count in which he was listed as the "CLAIMANT."  However,

each defendant was acquitted of the other three substantive mail

fraud counts in which the government had sought, unsuccessfully

it developed, to hold that defendant responsible as an aider and

abettor under Section 2 of Title 18 of the United States Code.

By way of format, McFadden's speedy trial and denial of counsel claims will be addressed initially, followed by a discussion of the Rule 29 motions shared by all of the defendants. Via the latter motions, defendants seek judgments of acquittal as to the mail fraud conspiracy count because "the government proved not the charged conspiracy, but multiple conspiracies, and as to the relevant conspiracy, . . . failed to prove 'a mailing.'" (Germany's Post-Trial Motion For a Judgment of Acquittal (DE 255) ("Germany Post-Trial Mot.") at p. 1; see also DE 262 and 263 (indicating that Brown and Thompson join in the arguments of Germany); May 9, 2015 Post-Trial Combined Motion Pursuant to Federal Rule[s] 29 and 33 (DE 270) ("McFadden's Post-Trial Submission")(indicating McFadden joins in the arguments of Germany).)

As to the substantive mail fraud counts, defendants argue those convictions must be vacated and a judgment of acquittal entered "because the government failed to establish venue in the Eastern District of New York and [also] failed to prove a 'a mailing.'" (Germany's Post-Trial Mot. at p. 1.)

MCFADDEN WAS NOT DENIED A SPEEDY TRIAL
UNDER THE SIXTH AMENDMENT OR THE
SPEEDY TRIAL ACT, 18 U.S.C. SECTIONS 3161 Et Seq.

The original indictment was returned on May 7, 2013 against eight defendants including McFadden, Thompson, Brown and

Germany.[1]  As noted, the trial began on January 20, 2015, i.e.
just short of twenty-one months thereafter.  Beginning in
September of 2013 and continuing through to trial, McFadden
declined to sign speedy trial waivers, unlike his co-defendants,
and repeatedly insisted on having the charges against him
promptly dismissed or adjudicated at trial.  (See, e.g., Sept.
20, 2013 Minute Entry (DE 78) and subsequent "Minute Entr[ies]"
and "WAIVER[S] OF SPEEDY TRIAL ORDER[S] OF EXCLUDABLE DELAY"
recorded in docket sheet.)

Against the above backdrop, McFadden maintains that his
speedy trial rights under the Sixth Amendment and the Speedy
Trial Act, 18 U.S.C. § 3161 et seq., have been violated, thereby
requiring the vacatur of his conviction and a dismissal of the
charges.

Before discussing McFadden's speedy trial claims in
detail, it warrants mentioned that he, notwithstanding his
numerous oral and written applications to the Court both pro se

---

[1]  The original indictment was replaced by a superseding
indictment filed on February 19, 2014, that being the accusatory
instrument under which the captioned defendants were tried.  The
only significant differences between the two instruments is that
the latter one did not list the four defendants who had pled
guilty pursuant to cooperation agreements and deleted the
substantive mail fraud counts in which they had been named.

and earlier through counsel,[2] never moved for a severance.[3]  It is not that that subject was not broached.  Indeed, Stuart J. Grossman ("Grossman"), in response to my inquiry,[4] informed the Court that he was of the belief that no ground existed to sever his then-client's case from that of his co-defendants. (Transcript ("Tr.") of Sept. 27, 2013 Status Conf. at 5-6.)  That conclusion dovetails with the reality of the situation given the central role McFadden played in the charged conspiracy as both its originator and its co-prime mover along with the government's cooperator Rashon Cooke ("Cooke").  To the extent McFadden seems to suggest that his Sixth Amendment rights were somehow impermissibly compromised by Grossman's stance, he provides no meaningful explanation as to why that is so.  (See McFadden's Post-Trial Submission at p. 10.)

### 1. Constitutional Speedy Trial Claim

---

[2]  Stuart J. Grossman, Esq. was McFadden's CJA attorney from May 8, 2013 (DE 21) until McFadden's June 20, 2014 motion for his removal (DE 131) was granted on July 10, 2014 (DE 141).

[3]  McFadden asserts "that his request for a severance was . . . denied." McFadden's Post-Trial Submission at 9.  That representation is incorrect.  It is made absent any cite, or even reference to the docket sheet, the transcript, or other portions of the record, and is contrary to both my firm recollection and that of the government.  (Gov't's May 31, 2015 Letter in Opp'n at p. 3 ("McFadden never filed a motion for severance.")).  Moreover, a perusal of docket sheet indicates that no such motion was ever made.

[4]  The Court's inquiry was prompted by McFadden's demands, in essence, for an immediate trial which, absent a successful motion for a severance, was not doable.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI.

As explained by the Second Circuit in United States v. Moreno, "[t]he Supreme Court has identified four factors that must be balanced when considering whether the right [to a speedy trial] has been violated: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 789 F.3d 72, 78 (2d Cir. 2015)(internal quotation marks and citation omitted).

The length of delay is the threshold consideration. Unless it is sufficiently long to be "'presumptively prejudicial' (i.e. long enough to trigger a Sixth Amendment inquiry)," no further analysis is warranted. Id. Although twenty one months from indictment to trial is not particularly long, see Flowers v. Warden, 853 F.2d 131, 133 (2d Cir. 1988) and cases cited therein, it is of adequate duration to require consideration of the remaining three factors. Moreno, 789 F.3d at 78, 82 n.10.

As for the reasons for the delay, movant provides scant information and argument beyond correctly noting the causes were not in the main attributable to McFadden,[5] and also opining"

---

[5] As explained by his current counsel, while [McFadden] was at times difficult, he did not delay this matter unduly, and in fact . . . it appears many of his more preposterous motions were dealt with quickly. (McFadden's Post-Trial Submission at p. 9.)

> There, is no doubt that the case was delayed
> a long time considering it had been prepared
> by an insurance company and given to the US
> Attorney.  That further the US Attorney spent
> most of it's time pressuring would be
> defendant[s] to turn state's evidence.

(McFadden's Post-Trial Submission at p. 9.)

The "insurance company" reference is not explained but insofar as the defrauded insurance companies may have been involved in discovering and investigating the subject wrongdoing, their activities presumably predated the indictment – or at least McFadden does not suggest otherwise – and are thus irrelevant to the issue of post-indictment delay.[6]  And the time the United States Attorney spent negotiating pleas and cooperation agreements with some of McFadden's original co-defendants served a "legitimate government purpose."  Cf. Moreno, 789 F.3d at 79. As a result, the weight I have attached to the associated delay whatever it may be – and movant provides no guidance in that regard – is modest.  Tellingly, no serious comment has been made suggesting prosecutorial negligence or bad faith in bringing McFadden to trial.

The third factor, i.e. the defendant's assertion of his right to a speedy trial, is satisfied by movant.  The same may not be said, however, as to the fourth and final factor,

---

[6]  Although McFadden, in explaining the provisions of Section 3161, mentions both pre-indictment and post-indictment delay, only the latter is pursued in his concomitant argument.

prejudice to the defendant.

The supposed prejudice succinctly identified by McFadden is that "the delay allowed the Prosecutor's to line up more 3500 witnesses most of whom will be on the Beach while Mr. McFadden enjoys his summer in prison." (McFadden's Post-Trial Submission at p. 9.) But, even if true, that is not the type of prejudice contemplated under the fourth factor. As explained by the Second Circuit in United States v. Alvarez:

> [P]rejudice is concerned with impediments to
> the ability of the defense to make its own
> case (e.g., if defense witnesses are made
> unavailable due to the government's delay);
> the opportunity for the prosecution to
> prepare for trial does not, on its own,
> amount to prejudice to the defense.

541 Fed. Appx. 80, 85 (2d Cir. 2013)(summary order)(citing United States v. Abad, 514 F.3d 271, 275 (2d Cir. 2008)("[T]he opportunity for the prosecution to prepare for trial does not, on its own, amount to prejudice to the defense.").

The Alvarez Court cited with approval United States v. Toombs, 574 F.3d 1262, 1275 (10th Cir. 2009) in which the Tenth Circuit concluded that a delay attributable to the government procuring the testimony of a co-defendant to testify against the defendant was not prejudicial in the sense envisioned by the Supreme Court in Barker v. Wingo, 407 U.S. 514 (1972). McFadden has failed to articulate any meaningful prejudice he suffered as a result of the temporal gap between indictment and trial.

In sum, McFadden has failed to demonstrate that an appropriate balancing of the aforementioned four factors warrants the relief requested under the Sixth Amendment's speedy trial provision.

## 2. Dismissal Similarly is not Warranted Under the Speedy Trial Act

McFadden has made no attempt to detail the manner in which the Speedy Trial Act was violated in his case. Instead he simply provides a partial overview of the time limitations set forth in Section 3161, supplemented by the conclusory comment – of arguable validity[7] – that he never "acquiesce[d] to any delay." (McFadden's Post-Trial Submission at p. 8.) Perhaps the thought is that a juxtapositioning of his speedy trial requests with the time that passed necessarily establishes the claimed statutory violation. If McFadden stood as the sole accused, that might be correct but such, of course, is not the case. His linkage to his supporting cast invalidates that argument as a matter of law. As correctly underscored by the government:

> The Speedy Trial Act, 18 U.S.C. § 3161 et.
> seq., provides, in relevant part, that
> excluded from a defendant's speedy trial
> clock is "a reasonable period of delay when
> the defendant is joined for trial with a
> codefendant as to whom the time for trial has
> not run and no motion for severance has been
> granted." 18. U.S.C. § 3161(h). The court

---

[7] See, e.g., January 17, 2014 Minute Entry (DE 105) which reads: "Defendant McFadden requests for next date 2/28/2014 but does not want to sign the waiver of speedy trial form."

> may also grant ends of justices continuances. 18 U.S.C. § 3161(h)(7), 8(A). Exclusion of time may be done by the court on its own motion or on the government's motion, both of which may be done over a defendant's objection. <u>United States v. Rill</u>, 2007 WL 495016 (W.D. Mo. 2007); <u>United States v. De La Cruz</u>, (D. P.R. 2007). There is one speedy trial clock for a multi-defendant case.

(Gov't's Oct. 9, 2013 Letter (DE 88), (quoted in Gov't's May 31, 2015 Letter in Opp'n at p. 3).)

### 3. Conclusion re McFadden's Constitutional And Statutorily-Based Speedy Trial Claims

For the reasons provided, McFadden's Speedy Trial claims are denied. Attention will now be directed to his assertion that his Sixth Amendment right to counsel was denied.

### MCFADDEN, WHO REPRESENTED HIMSELF AT TRIAL, WAS NOT DENIED HIS RIGHT TO COUNSEL

McFadden's post-verdict counsel opines that the Court should "have allowed [McFadden] one more chance to retain [sic] a CJA counsel or to retain one if he had the appropriate resources," rather than denying his request for a continuance. (McFadden's Post-Trial Submission at p. 11.) That refusal, it is argued, impermissibly infringed on McFadden's right to counsel. The record — outlined below — is inconsistent with that claim:

(1) CJA counsel Grossman was appointed as McFadden's attorney at his arraignment on May 2, 2013 (DE 21);

(2) By motion dated June 20, 2014 (DE 131 and 133), McFadden moved to remove Grossman as his attorney and to

proceed _pro se_ apparently based on the belief, inter alia, that the prosecution, CJA counsel and the Court "act[ed] in concert and [are being] paid from a common source and/or sources" thereby thwarting his efforts to obtain a speedy trial.[8] (McFadden's June 20, 2014 Decl. in Supp. (DE 133-1) at ¶ 5.) In addition, McFadden complained that his "Court appointed attorney through his coordinated efforts with the prosecution attempted to bribe [him] from of [sic] [his] innocent plea when [he] was in his office several months ago with [his] career and business advisor with power of attorney." (_Id._ at ¶ 9.) Although no evidence was proffered by the movant suggesting the legitimacy of that claim, Grossman was released with the thanks of the Court on July 10, 2014 given the then friction between client and counsel. (DE 141);

(3) Upon relieving Grossman as counsel, McFadden was asked if he a) intended to hire counsel, b) would like to have another CJA attorney appointed either permanently or while he sought counsel, or c) proceed _pro se_. (July 10, 2014 Tr. at 3.) McFadden elected to "represent [him]self until [he] find[s] an attorney." (_Id._) Accordingly, a hearing was held,[9] (_id._ at

---

[8] Based on the Court being named as a coconspirator by McFadden, I, _sua sponte_, addressed the recusal issue. (Tr. of July 10, 2014 Status Conference at 5-8.) Having done so, I concluded that recusal would not be appropriate. (_Id._ at 8.)

[9] _See generally_ _Benchbook for U.S. District Judges_, § 1.02: "Assignment of counsel or _pro se_ representation," at pp. 6-7.

10-21), at the conclusion of which I found his decision to be "knowing and voluntary" though, in my judgment, "ill-advised." (Id. at 21.)

The case was then adjourned until July 21, 2014 for a further status conference;

(4) On July 21, 2014, McFadden expressed his intent to file another motion, whereupon a briefing schedule was set and a further conference date established for September 12, 2014. (DE 147);

(5) At the status conference held on September 12, 2014, the trial date of January 20, 2015 was designated with jury selection to begin at 9:30 a.m. (DE 154);

(6) On October 21, 2014, McFadden's motions for a free trial transcript and for funds to hire a private investigator were granted and, more importantly for present purposes, he was reminded once again that I stood ready to "assign CJA counsel should he change his mind at some point." (DE 163.) Moreover, I advise him of my intention "to appoint stand-by counsel." (DE 171);

(7) CJA Counsel Maureen S. Hoerger ("Hoerger") was the attorney assigned as stand-by counsel. However, as I recall, when she endeavored to contact McFadden to determine what assistance she might be able to provide, he declined to see her and thereafter accused her of unethical solicitation. His

position was succinctly articulated during a January 16, 2015 status conference when I asked him about his position on a magistrate judge selecting the jury via the following non-responsive reply: "I'm asking that she removed from the court, off my case, and be sanctioned.  First off."  (Tr. of Jan. 16, 2015 Status Conf. at 24; see also id. at 30 ("I also sent a complaint to the bar association about her.").)  When asked if he wanted me to appoint another stand-by counsel in lieu of Hoerger, he said "No."  (Id. at 31.)  I declined to leave him without stand-by counsel and, accordingly, Hoerger continued with her assignment, dutifully attending every court session from beginning to end at-the-ready to assist McFadden.  Although repeatedly reminded of her presence and function, McFadden never sought this experienced and skilled litigator's input or advice;

(8) The January 16, 2015 status conference is also significant because on that Friday, he first asked to adjourn the Tuesday, January 20th trial date — which, as earlier noted, had been scheduled approximately four months before — so that he could endeavor to obtain "a pro bono lawyer."  (Id. at 29.)  Notably, during that interim period, McFadden was involved in numerous status conferences acting pro se, typically as a vocal participant, and made several motions both orally and in writing.  Yet, no earlier request for an adjournment was ever voiced on the subject ground;

(9) As part of his eleventh hour request for a continuance, McFadden advanced the notion that he should be able to select an attorney with the understanding that the person he chose would be compensated with public funds. As a corollary to that proposition, McFadden explained that he would be amenable to reviewing the CJA list and interviewing those listed "so [he] can pick [his] lawyer . . . not one that [the Court] choose for [him]." (Id. at 30.) He again declined my offer to "replace Ms. Hoerger and appoint another attorney from the CJA list." (Id. at 33.)

The January 16th Status Conference ended with McFadden's belated request for a continuance being denied, coupled with the comment that the trial would begin on January 20, 2015 as scheduled the prior September. (See id. at 35, 36.)

(10) On January 20, 2015, McFadden filed a letter on ECF "request[ing] one week (7 days) to negotiate a retainer agreement with one or more" of three listed attorneys, viz. Michael Previto, Esq. Steven Broseum, Esq. and Jeffery Bettan, Esq. (DE 190.)

No information was provided to suggest any of those attorneys were prepared to enter the fray at any time within the foreseeable future, if ever. McFadden explained that he first contacted Mr. Previto "[s]ometime around the summertime [of] . . . 2014" but had had no contact with him since then. (Jan. 20,

2015 Tr. at 8.)

McFadden apparently called Mr. Broseum's office "a few days" prior to the scheduled trial date in an unsuccessful effort to set up an appointment.  This would have been his first contact with Mr. Broseum had an appointment been arranged.  (Id. at 8-10.)

The third attorney cited by McFadden in his January 20th request for a seven day continuation actually met with McFadden "sometime in the summertime after [he] left Mike Previto."  (Id. at 10-11.)  However, he could not afford "the fee" quoted by Mr. Bettan.  (Id. at 12.)

McFadden seemed to suggest that if given time conceivably family members would be in a position to finance his defense because "[s]ome lawyers are willing to take $7,500 to $10,000.  That's something that could possibly be raised in due time . . . . "  (Id. at 13.)  Left unexplained, was (a) whether the fee mentioned was a retainer as presumably it was given the amount said to be quoted, and (b) whether the attorney or attorneys referenced were included in the three earlier identified.  Additionally absent from the proffer was some specificity as to the meaning of "possibly" and "in due time" in the then context;

(11) By way of partially reiterating the relevant facts, McFadden declined repeated pretrial offers to have CJA

counsel assigned to represent him or, alternatively, as stand-by counsel in lieu of Hoerger.[10]  He elected instead to proceed pro se pending the results of his endeavor to retain private counsel. But his efforts in that regard were feeble at best and evinced no meaningful prospect of success unless funded from the public fisc.  But, notwithstanding McFadden's conclusory protestations to the contrary, his Sixth Amendment right to be defended by counsel of his choosing does not extend to having someone else pick up the tab.  Cf. Caplin & Drysdale v. United States, 491 U.S. 617, 626 (1989).

Given the amorphous state of McFadden's belated effort to retain counsel, as just detailed, his request for a continuance was denied.  In making that determination, I considered (1) the age of the case, (2) the probability that, in the unlikely event trial counsel was retained, his or her entry would necessitate further lengthy delays attributable to that attorney investigating and preparing for trial, and (3) the concomitant difficultly of setting another trial date anytime in the foreseeable future given the busy trial schedules of the attorney representing McFadden's three co-defendants.  (See Jan. 20, 2015 Tr. at 16-17.)  In addition, it was my view that

---

[10]  Parenthetically, he rejected several like offers made after the scheduled trial commencement date of January 20, 2015. (See, e.g., Jan. 22, 2015 Tr. at 512, 558-59, Jan. 26, 2015 Tr. at 26, and Jan. 29, 2015 Tr. at 441-42.)

McFadden's last minute motion was part of an ongoing effort to derail the prosecution and to interject arguable error into the record. (Id. at 18.)[11]

I directed that the case proceed to trial as scheduled and, I believe, "reasonabl[y so] under the circumstances." United States v. Pascarella, 84 F.3d 61, 68 (2d Cir. 1996)(internal citations and quotation marks omitted). Cf. United States v. Rosenthal, 470 F.2d 837, 844 (2d Cir. 1972)("We and other courts of appeals have repeatedly made clear that the right to counsel cannot be . . . manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice. Judges must be vigilant that requests for appointment of a new attorney on the eve of trial should not become a vehicle for achieving delay.)(internal citations and quotations marks omitted)(ellipses in original); United States v. Llanes, 374 F.2d 712, 717 (2d Cir. 1967); Catalano v. United States, 311 F.2d 186, 189 (2d Cir. 1962).

In sum, McFadden's request to vacate his conviction due

---

[11]  Other manifestations of that apparent strategy include (1) McFadden's previously mentioned claim that the Court, the prosecution, CJA counsel Grossman and the victimized insurance companies had conspired to deprive him of his constitutional rights uttered absent a shred of corroborative evidence, and (2) his belatedly claimed inability to hear which the Court addressed by providing him with a "real time" copy of the transcript throughout the trial even though he had often engaged in lengthy colloquy with the Court, the prosecution and others without any apparent auditory impediment prior to the complaint being made.

to a purported violation of his Sixth Amendment right to counsel
is denied.

GERMANY'S VENUE-BASED MOTION FOR A<br>
<u>JUDGMENT OF ACQUITTAL AS TO COUNT FIVE</u>

Count Five, a substantive mail fraud count, alleges
that Germany on October 14, 2010, caused to be delivered to "John
Doe . . . [,] 950 Third Avenue, New York, New York 10022," via
the "United States Postal Service," a "[c]heck for personal
injury." (Superseding Incitement, ¶ 16.)  The referenced Third
Avenue address is in the Southern, not the Eastern District of
New York.  Paragraph 15 of the Indictment sites the charged
criminality with having occurred "within the Eastern District of
New York and elsewhere."  (<u>Id.</u> ¶ 15.)

Germany contends that the "evidence with respect to
Count Five was insufficient to establish venue in the Eastern
District of New York" thus mandating its dismissal.  (Germany's
Feb. 5, 2015 Letter in Supp. (DE 215) at p. 1.)

The government bears the burden of proving proper venue
– a non-element of a crime – by a preponderance of the evidence.
<u>United States v. Ramirez</u>, 420 F.3d 134, 139 (2d Cir. 2005).  In a
Rule 29 (a)[12] and (c) context, as here, the sufficiency of the
evidence must be construed most favorably to the non-movant

---

[12]  The Court reserved decision on defendants' Rule 29(a)
motion made at the conclusion of the government's case-in-chief.
(Feb. 4, 2015 Tr. at 763.)

government. Id.

A "prosecution under the mail fraud statute is
permissible only in those districts in which a proscribed act
occurs, i.e., in which the defendant 'places,' 'deposits,'
'causes to be deposited,' 'takes,' or 'receives' mail or
'knowingly causes' mail 'to be delivered.'" United States v.
Brennan, 183 F.3d 139, 147 (2d Cir. 1999); see also United States
v. Ramirez, 420 F.3d at 146.

A juxtapositioning of the proscribed acts listed in
Brennan with the evidence adduced at trial indicates that Count
Five was improperly venued. The government concedes that point[13]
but maintains that "[b]y waiting until the day after the defense
case was presented and immediately prior to summations, defendant
Germany waived any venue argument with regard to a mailing
occurring in the Eastern District of New York." (Gov't's May 31,
2015 Letter in Opp'n at p. 6.)

"It is settled law in this [C]ircuit that a finding of
waiver of objections to venue is proper when statements by the
prosecutor clearly reveal this defect and defendant fails to

---

[13]  In the government's May 31. 2015 letter in opposition,
the statement is made that: "Defendants' objections to venue have
no merit except for Germany's objection as to Count 5, his
substantive count of conviction . . . . [but that] objection . .
. was untimely and has been waived." (Gov't's May 31, 2015
Letter in Opp'n (DE 271) at p. 4-5).

object." <u>United States v. Sutton</u>, 13 F.3d 595, 598 (2d Cir. 1994)(internal quotation marks omitted).  It is similarly well established that venue defects evident from a reading of indictment are waived unless raised prior to trial.  <u>See</u> <u>United States v. Kahn</u>, 821 F.2d 90, 93 (2d Cir. 1987).

A perusal of the indictment here does not disclose the venue defect.  Count Five's reference to a law office in the Southern District did not provide the requisite notice because defendants could have reasonably assumed that the government would introduce proof linking Count Five to this district before resting under the "and elsewhere" language found in paragraph 15. (Superseding Ind., ¶ 15.)  But this never happened.

None of the defendants but Brown put in a case and Brown's presentation consisted solely of calling a character witness.  The government's position, as I understand it, is that even if the landscape was not materially altered in the interim between the close of its case-in-chief and Germany's Rule 29(a) venue motion, the fact that Brown called a character witness renders Germany's motion untimely under the doctrine of waiver. Among the cases cited by the government in support is <u>United States v. Menendez</u>, 612 F.2d 51 (2d Cir. 1979).  That decision explains in general terms that the doctrine of waiver is properly invoked "(a) when the indictment or statements by the prosecutor clearly reveal this defect but the defendant fails to object [or]

(b) when, after the government has concluded its case, the defendant specifies grounds for acquittal but is silent as to venue." Id. at 55 (internal quotation marks omitted).

Germany's venue complaint was not an afterthought. Instead, it was part of his Rule 29(a) motion which was presented succinctly under the circumstances. The government rested on February 3rd (Feb. 3, 2015 Tr. at 740), whereupon Germany orally provided the contours of his motion for a judgment of acquittal. (Id. at 741-48.) In doing so, the venue objection as noted by the government was not broached. I then asked that the motion be made in writing once counsel had an opportunity to review relevant portions of the trial transcript. (Id. 747-48.) The next day, Germany filed a letter seeking a judgment of acquittal based on Fyffe's mailing testimony – discussed infra — and the day after that, i.e. on February 5th, Germany filed a "supplement[]" to his Rule 29(a) motion, writing about the venue argument now under discussion for the first time.[14] (See DE 211 and 215.)

The question is whether the brief but sequential presentation of Germany's motion bars the venue issue from being addressed on the merits. That question calls for a negative

---

[14] Although the venue issue was not discussed in the February 4th letter, it was specifically addressed during relevant colloquy between Court and counsel on that date with the understanding that Germany was still researching the issue. (Trial Tr. at 821-822.)

answer because (1) Germany proceeded with reasonable speed over a short period of time in fully developing his Rule 29(a) motion, and (2) the government does not suggest, no less claim that it suffered any concomitant prejudice.

Under the procedural circumstances outlined above, the Court concludes that Germany did not waive his venue objection and, given the government's previously mentioned concession, Count Five is dismissed.[15]

### DEFENDANTS' MOTIONS FOR ACQUITTAL AS TO THE SUBSTANTIVE MAIL FRAUD COUNTS BASED ON PURPORTED INSUFFICIENT EVIDENCE OF MAILING

Germany has moved for a judgment of acquittal as to his conviction for substantive mail fraud under Count Five. Each of the co-defendants has joined in that application as to their corresponding individual substantive counts of conviction.

As explained to the jury during the Court's instruction, one of the elements of mail fraud is that in the execution of the charged scheme to defraud, "the defendant you

---

[15] It is my understanding that only Germany has attacked the substantive mail fraud count of which he stands convicted on venue grounds, although McFadden, Thompson and Brown join in Germany's "mailing" argument — discussed in the text, _infra_ — as to those counts and as to Count One.

In any event, Germany's venue argument as to his individual substantive mail fraud count is of no avail to the other defendants because the settlement checks from RepWest payable to Thompson, Brown and Germany and their respective attorneys were each directed to locations in the Eastern District of New York.

are considering used or caused the use of the mails as alleged in the indictment." (Feb. 9, 2015 Tr. at 1036.) Germany contends that the government's proof as to that critical element was inadequate as a matter of law because the witness called to establish the mailings testified in the "present tense." The excerpted portions of trial record - with running commentary and transcript cites provided by the movant - read as follows:

> Fyffe commenced her "mailing testimony" in connection with a personal-injury check that RepWest had addressed to Byron Dudley, who entered into a cooperation agreement with, and testified for, the government. Fyffe testified:
> > Q. Government's Exhibit 1 in evidence ... , do you see that ... in front of you?
> > A. Yes.
> > [. . .]
> > Q. Who are the payees on that check?
> > A. It's made payable to Byron Dudley and Citelis Law Firm
> > ....
> > Q. In terms of this check, how *was* this check delivered by U-Haul to the payees?
> (Trial Tr. 629-30) (emphasis added [by Germany]).
> > The government properly framed its "mailing question" using the past tense of the verb "to be." An attorney's question, however, is not evidence. Only the answer to a question is evidence.[16] *(See* the Court's Jury Charge, Trial Tr. 1007.) And unlike the question, Fyffe's answer came in the present tense:

---

[16] Although a question is not evidence that does not mean it is irrelevant in evaluating the corresponding answer. For example, if a witness to an automobile accident is called upon to describe where she was located when she observed the collision, her response of "on the northeast corner of Elm and Locust" would be meaningless absent the context provided by the inquiry. So here, the fact A.U.S.A. Kelly began the line of inquiry using the past, i.e. appropriate tense is a circumstance the jury may have considered in evaluating what Fyffe was telling them.

> A. The claims adjuster *enters* the check
> information such as the amount, who *it's*
> payable to and the address *it's* to be sent
> to into our computers. It *is* printed in
> Phoenix, Arizona, where our home office *is*
> located, and from there *it's* placed in the
> mail.

(Trial Tr. 630) (emphasis added [by Germany]).

Turning her attention to a check that Rep West had addressed to non-cooperator and non-trial defendant Daniel Osborne, Fyffe testified:

> Q. Placing on the screen Government
> Exhibit 2 ....
> ....
> Who are the payees on this check,
> Government Exhibit 2 in evidence?
> A. The check is made payable to Daniel
> Osborne and the Law Offices of Andrew
> Hirschhorn as attorney.
> Q. How *is* this check delivered to the
> payees?

(Trial Tr. 631-32) (emphasis added [by Germany]). In contrast to its question about the Dudley check, the government framed its question about the Osborne check using the present tense of the verb "to be." Fyffe's answer also came in the present tense. And once again it came in the present tense of each verb that she used:

> A. Again, claims adjuster *enters* all the
> information into their computer, the amount
> of the check, the payees and where the check
> *is* to be sent to. *It's* printed in our
> home office in Phoenix. From there *it's* placed in
> the mail.

(Trial Tr. 632) (emphasis added [by Germany]). Focusing next on the trial defendants, Fyffe continued:

> Q. That's true of all four of these
> exhibits, 2, 3, 4 and 5 in evidence?
> A. Yes.
> ....
> Q. ... Government Exhibit 3 in evidence
> .... What is the amount of this check?

```
        A. The amount is $12,500.
        Q. Who are the payees on this check?
        A. The payees are Allah Brown and Law
           Offices of Andrew Hirschhorn as
           attorney.
        Q. Why was this check issued?
        A. Again, this was in settlement of the
           bodily injury, personal injury claim.
        Q. It rose out of an accident on what
           date?
        A. ... [F]or an accident date of January
           22, 2010 under Repwest claim number
           00217249-2010.
        Q. Placing Exhibit 4 in evidence on the
           screen. What is the amount of this
           check?
        A. The amount of this check is $12,500.
        Q. Who are the payees on this check?
        A. Daniel Thompson and Law Offices of
           Andrew Hirschhorn as attorney.
        Q. Why this was check issued?
        A. ... [F]or a bodily injury claim for
           an accident date of January 22, 2010
           under RepWest claim number 00217249-
           2010.
        Q. ... This is Government Exhibit 5 in
           evidence. What's the amount of this
           check?
        A. The amount of this check is $25,000.
        Q. And who are the payees of this $25,000
           check?
        A. This check is payable to Ahmad Germany
           and Ferraro and Wyatt, PLLC as
           attorneys.
        Q. What was this $25,000 check in payment
           for?
        A. This was also a payment for ...
           settlement of a bodily injury claim
           for date of accident of January 22,
           2010 under Repwest claim number
           00217249-2010.
      (Trial Tr. 632-34.)
```

(Germany's Mem. in Supp. (DE 255) at pp. 3-7.)

In essence, Germany proffers that "Fyffe's testimony demonstrated RepWest's procedures only on the day of her testimony. It did not establish that RepWest had mailed the checks in September and October 2010, some four and one-half years prior her testimony." (<u>Id.</u> at p. 7.)

In support of the proposition that Fyffe's error as to tense invalidates the substantive mail fraud conviction of Germany, as well as those of Thompson and Brown,[17] movant directs the Court's attention, by way of a "<u>cf.</u>" cite, to <u>United States v. Allen</u>, 88 F.3d 765, 768-69 (9th Cir. 1996), <u>United States v. Jones</u>, 16 F.3d 487, 491-92 (2d Cir. 1994), <u>United States v. Chin</u>, 910 F. Supp. 889, 893-95 (E.D.N.Y. 1995) and <u>United States v. Foote</u>, 238 F. Supp. 2d 1271, 1277 (D. Kan. 2002). In each of those cases, however, the jurisdictional inquiries involved simple "stand alone" questions meaning ones, unlike here, that were not part and parcel of a larger line of inquiry.

In <u>Allen</u>, the issue was whether a defrauded financial institution was federally insured in 1988-89. In an effort to establish that it was, the following exchange between the prosecutor and his witness took place:

---

[17] As to McFadden's conviction under Count Four, <u>see</u> discussion at p. 48-49 <u>infra</u>.

Q. . . . Ms. Boyd, is the Southern Oregon
                    Federal Credit Union insured by the
                    National Credit Union Administration?
                    A.  Yes, it is.
                    Q.  So it's a federally-insured credit union?
                    A.  Yes.

Allen, 88 F.3d at 768.

        As noted by the Ninth Circuit, "[t]he problem with

this testimony is that it took place during trial in

January, 1994.  Boyd answered the prosecutor's questions in

the present tense.  Thus, while her testimony may establish

the credit union's insurance status in 1994, it does not

establish that the credit union was insured when Allen made

his fraudulent statements in 1988-89."  Id. at 769.

        Similarly, in Jones the question asked and answer

given were simple and straight forward.  The charges leveled

against Jones included illegal possession of a handgun.  To

establish federal jurisdiction, the weapon had to have

crossed state lines at some point.  If the testimony,

contrary to the fact, indicated that handguns fitting the

description provided by witnesses were never manufactured in

New York, the interstate commerce component of the

government's proof would have been, ipso facto, established.

But the testimony actually elicited, viz. that handguns were

not presently manufactured here, obviously did not satisfy

the government's burden.  See Jones, 16 F.3d at 491-92.  The
same type of self contained, simple questions and answers
are found in Chin and Foote, the remaining two cases cited
by Germany on this point.

The scenario here is markedly different.  By way
of background, Fyffe, a member of the New York bar, was
employed and had been for eight years prior to the trial, as
a "litigation adjuster with Repwest [sic] Insurance
Company."  (Feb. 3, 2015 Tr. at 625-628.)  As such, she was
so employed when the subject checks were issued.  RepWest
"handle[d] all [insurance] claims related to U-Haul," one of
the vehicle owners victimized by defendants' staged
automobile accidents.  (Id. at 625.)  Fyffe's role as a
litigation adjuster called for her to "direct[] our defense
counsel during discovery, approv[e] motions . . . . and
ultimately see[] the file through to trial or settlement."
(Id. at 627.)  Based on her job function and years of
experience, she understandably answered in the affirmative
when asked whether she was "fully familiar with documents
contained within a RepWest claims file?"  (Id. at 628.)

With the above foundational evidence in place,
Fyffe was shown Government's Exhibit 1 which she identified

as "a bodily injury settlement check issued by RepWest" to government cooperator Byron Dudley and his lawyer.  (Id. at 628-29.)  Fyffe was then asked "how was this [i.e. Ex. 1] delivered by U-Haul to the payees?"  (Id. at 630.)  In answer, she explains as noted in the previously quoted excerpt from Germany's submission:

> The claims adjuster enters the check information such as the amount, who it's payable to and the address it's to be sent to into our computers.
>
> It is printed in Phoenix, Arizona, where our home office is located, and from there it's placed in the mail.

(Id. at 630.)

In an apparent effort to accelerate the process, Fyffe was then shown government exhibits 2 ($25,000 RepWest settlement check to Daniel Osborne and his attorney), 3 ($12,500 RepWest settlement check to defendant Brown and his attorneys), 4 ($12,500 RepWest settlement check payable to defendant Thompson and his attorney), and 5 ($25,000 RepWest settlement check payable to defendant Germany and his attorney), and asked how they were delivered to the payees. Fyffe replied:

> Again, claims adjuster enters all the information into their computer, the amount of the check, the payees and where

> the check is to be sent.  It's printed in
> our home office in Phoenix.  From there
> it's placed in the mail.

(Id. at 631-32.)

It is apparent from the rear side of each of the checks that all were cashed.  Exhibits 2, 3, 4, and 5, like exhibit 1, were received into evidence without objection. (Id. at 631.)

Fyffe's testimony could have been legitimately understood by the jury as providing them with the standard check cutting and mailing procedure in effect — both earlier in this decade when the subject checks were processed and at the time of trial — , rather than simply furnishing current information irrelevant to their fact finding mission. Indeed, that is obviously how they viewed the information given their verdict.  Cf., e.g., United States v. Sliker, 751 F.2d 477, 484-85 (2d Cir. 1984)("We hold, although without enthusiasm, that where, as in this case, the evidence is oral testimony that the bank is insured, and the interval between the crime and the trial is not great, it is reasonable to conclude that 'viewed in context, the jury could draw the inference that the bank was insured at the time of the robbery,' – in other words, that this jury could

take 'is' to mean 'is and has been.'") (internal citations omitted); United States v. Bortnick, 2005 WL 1693924 at *7-8 (E.D. Pa.)("The thrust of Defendant's [unsuccessful] argument with respect to the relationship between First Union and Congress is that all of the above testimony was in the wrong tense and that therefore the government's proof was insufficient to show that, at the time of the offense, . . . First Union was federally insured . . . . Defendant relies upon the Ninth Circuit's holding in United States v. Allen, 88 F.3d 765 (9th Cir. 1996). In that case, the Ninth Circuit vacated a conviction for making false statements in loan applications to a federally insured financial institution in violation of 18 U.S.C. § 1014 because the only testimony on the bank's insurance status was offered in the present tense. . . . The Court's research has uncovered no other Circuit that has taken a similar position on the sufficiency of present-tense testimony to establish the existence of a certain state of affairs in the past.); United States v. Brooks, 2009 WL 484206 at *2 (E.D. Pa. Feb. 26, 2009)("While Mr. Brooks tries to make much of Ms. Gontek's pattern of speech of speaking in the present tense (i.e., at the time of her 2008 trial testimony), and thus

argues that her testimony did nothing to provide the jury with information about PNC's interstate commerce status in 2005, the unmistakable context of Ms. Gontek's testimony would have permitted the jury to conclude reasonably that the information she imparted about her employer, PNC Bank, was accurate for the relevant time period for this case, namely 2005).")

Unlike the situation in each of the cases cited by Germany in which the critical inquiry at its core essentially called for a "yes" or "no" response, the questions asked of Fyffe were tethered to specific exhibits which were both before her and the jury during the questioning. And those exhibits, viz. the cashed settlement checks – listing the Arizona maker and New York individual defendants and law firm payees – provided, inter alia, the dates of payment and the accident claim number. It was against this backdrop that Fyffe's mailing testimony was given.

In sum, defendants' tense-based Rule 29 argument as to the mailing element of their respective substantive mail fraud convictions is found to be thought-provoking but, ultimately, unconvincing given the "exceedingly differential

standard" governing such applications.  <u>United States v.</u>
<u>Feng Ling Liu</u>, 2015 WL 4460898 at *5 (S.D.N.Y. July 20,
2015) (citing cases).

> DEFENDANTS' "MAILING" ARGUMENT AS TO
> COUNT ONE PREMISED ON THE PROPOSITION
> THAT THE CONSPIRACY CHARGE REQUIRED
> EVIDENCE OF AN <u>ACTUAL</u> MAILING GIVEN
> <u>THE COURT'S INSTRUCTION TO THE JURY</u>

Defendants seek a judgment of acquittal as to
Count One, arguing that the conspiracy count — as charged to
the jury — "required <u>actual</u> use of the mails," proof of
which, in their view, never materialized.  (Germany's Mem.
in Supp. at p. 11 (emphasis in original).)

The jury was instructed that "[t]here are two
elements of the crime of conspiracy," to wit:

> First, it must be proved that two or more
> persons entered into the particular unlawful
> agreement charged in count one of the
> indictment sometime on or about and between
> March 2009 and July 2011, and, second, it
> must be proved that the defendant you are
> considering knowingly and willfully became a
> member of the conspiracy.

(Feb. 9, 2015 Tr. at 1024.)

After Germany broached the subject about the
desirability of mentioning the potential use of the mails in the
mail fraud conspiracy instruction, the Court further charged:

> As to the mailing component of the
> conspiracy, it is sufficient if it was
> reasonably foreseeable to the conspirators

> that if one or more of the goals of the
> conspiracy was accomplished, that the United
> States mails would have been used pursuant to
> the scheme in some fashion, such as, for
> example, in submitting claim documents to or
> in receiving payment from one or more of the
> carriers identified in the indictment.

(Id. at 1025-26.)

Germany seemingly maintains that by charging the excerpt quoted immediately above, Court added the need to show the "actual use of the mails" to the elements the government would have been otherwise required to prove. (Germany's Mem. in Supp. at p. 11.)  That is so, Germany posits, because "[t]he Court's utilization of the conditional-perfect tense meant that, to find a defendant guilty of the mail-fraud conspiracy, the jury had to conclude 'that the United States mails [were] used pursuant to the scheme.'"  (Id. at pp. 10-11.)[18]

This argument by Germany is unpersuasive.  To begin with, the Supreme Court has "repeatedly . . . cautioned that instructions must be evaluated not in isolation, but in the context of the entire charge."  Jones v. United States, 527 U.S. 373, 391 (1999).  Here, as noted, the jury was told that to warrant a guilty verdict as to the conspiracy count, the

_____

[18]  For those who may not be familiar with the grammatical term "conditional perfect," movant fills the void: "the conditional perfect [tense] is used to refer to a hypothetical . . . event or circumstance placed in the past, contingent on some other circumstance," citing Wikipedia, http://en.wikipedia.org/wiki/conditional_perfect. (Germany's Mem. in Supp. at p. 10.)

government was required to prove the two elements previously quoted, nothing more.  They were also instructed to consider each count separately.  It was within that context that the targeted passage was read to the jury so that they would appreciate that, while an actual mailing was not an element of the conspiracy, the foreseeable impact on interstate commerce if one or more of the conspiratorial goals was realized could be considered in determining the nature of the conspiracy and a particular defendant's membership therein.

A common sense review of the full conspiracy charge, as read to the jury, does not support the proposition advanced by Germany even if the referenced language, arguendo, was framed in the conditional perfect tense.  And that latter proposition seems doubtful given the inclusion of "foreseea[bility]" language, and of the term "if," in that passage.  Foreseeability by its very nature is prospective in character, and "if" signifies a conditional event denoting something that may or may not actually reach fruition.  Which is to say, that linguistic combination is hard to square with the argument that the Court's conspiracy instruction required a finding of actual use of the mails for the prosecution to prevail.  Simply put, the jury was not so instructed.

And even if, contrary to the fact, it was, the government satisfied the hypothetical mailing element vis-a-vis

the conspiracy Count through Fyffe's testimony and also via the receipt into evidence of exhibit 6 pertaining to the mailing of a "no-fault" application for McFadden to RepWest from Valley Stream in the Eastern District of New York.

In sum, defendants' Rule 29 motion for a judgment of acquittal as to Count One based on a purported mailing deficiency is denied.

DEFENDANTS' APPLICATION FOR A JUDGMENT
OF ACQUITTAL AS TO COUNT ONE ON THE
GROUND THE TRIAL PROOF ESTABLISHED
MULTIPLE CONSPIRACIES RATHER THAN THE
SINGLE CONSPIRACY CHARGED

Defendants also maintain that "[w]ith respect to the mail fraud conspiracy count, the government proved not the charged conspiracy, but multiple conspiracies . . . ."[19] (Germany's Mem. in Supp. at p. 1; as earlier noted, the other defendants joined in Germany's motion as to this point.)

Preliminary it warrants mention that none of the defendants requested a multiple conspiracy charge, nor did any raise a relevancy objection when the government introduced evidence of those staged automobile accidents now said to be

_____

[19]    It is unclear to the Court whether the quoted excerpt in the text – when considered in conjunction with other statements made on defendants' behalf – is intended to indicate that proof at trial merely established, if anything, a series of separate conspiracies other then the one charged or including the one charged.   In an effort to assure coverage of all significant arguments advanced by all defendants, I will proceed consistent with the belief it is the former.

beyond the ambit of the charged scheme.  Accordingly, to obtain
the relief sought, defendants must "show that (1) the indictment
charged a single conspiracy, but the proof disclosed several
independent conspiracies, and (2) defendant was so prejudiced by
this variance as to be denied a fair trial."  United States v.
DeSimone, 119 F.3d 217, 226 (2d Cir. 1997).  These two
requirements will be addressed in turn.

### 1.  Single or Multiple Conspiracies?

Defendants posit that, in addition to the charged
conspiracy, the government "at trial . . . introduced evidence of
five additional conspiracies and of twenty-seven additional
conspirators."  (Germany's Mem. in Supp. at pp. 28-29.)   In the
prosecutor's view, not only did the indictment allege a single
conspiracy, but the jury's verdict, construing all the evidence
most favorably to the government, is fully in sync with that
charge.  Query: did the proof at trial establish as a matter of
law multiple, but separate conspiracies "operating independently
of each other" on the one hand, United States v. Maldonado-
Rivera, 922 F.2d 934, 962 (2d Cir. 1990), or a single overarching
conspiracy "involv[ing] two or more phases or spheres of
operation" on the other.  United States v. Abdallah, 528 F. Appx.
79, 81-82 (2d Cir. 2013).

There was considerable evidence placed before the jury
to suggest that the participants in the staged accidents knew or

had reason to know that the conspiracy and its membership extended beyond themselves.  Government cooperator Cooke testified that his role was to help "recruit and coach members of the accident [teams]," (Jan. 28, 2015 Tr. at 90), and to explain to them how to act when the police arrived at the accident site, making sure to feign "some type of injury to be recorded."  (Id. at 91.)  Tellingly, those instructions detailed the operable process vis-a-vis "the staged accident and going to the medical center, [receiving unnecessary] treat[ments], out of [which] would come a lawsuit down the road."  (Id. at 91-92.)  Among the beneficiaries of Cooke's coaching were "Shawn McFadden, Allah Brown, Daniel Thompson and Ahmad Germany . . . ," i.e. the four captioned defendants.  (Id. at 92.)

Cooke's coaching, – particularly his explanation about the complicit health care and legal professionals on board — would alert most persons to the probability that the staged accident or accidents in which they played a part were not isolated incidents but rather part of a broad-based scheme in which all — including themselves — benefitted from the scope and sophistication of the multi-layered operation.  See United States v. Sureff, 15 F.3d 225, 230 (2d Cir. 1994).  Which is to say, to the extent defendants contend that the proof at trial merely established several separate conspiracies, that argument is not convincing.

        2.   Even if, <u>Arguendo</u>, the Evidence at
               Trial Established Multiple Conspiracies,
               One of the Proven Conspiracies Involved
               the Four Captioned Defendants as Charged
               <u>in Count One of the Indictment</u>

"[E]ven if multiple conspiracies are found, the jury should convict the defendant if it finds that one of the proven conspiracies is the one alleged in the indictment and that the defendant was a member of it."  <u>United States v. Thompson</u>, 76 F.3d 442, 454 (2d Cir. 1996); <u>see</u> <u>United States v. Richardson</u>, 532 F.3d 1279, 1288-89 (2d Cir. 2008)("The prosecution need not prove exactly what the indictment alleges.  It is sufficient for the government to prove a subset of the [conspiracy] allegations in the indictment, as long as the allegations that are proved support a conviction for the charged offense"); <u>United States v. Berger</u>, 224 F.3d 107, 114 (2d Cir. 2000)("[A] charge should not instruct that a jury must acquit whenever it finds multiple conspiracies; acquittal is required only if the jury finds that the charged conspiracy is not one of the conspiracies that has been proved."); <u>see generally</u> Mehler, Gleeson and James, <u>Federal Criminal Practice</u>: <u>A Second Circuit Handbook</u>, Fifteenth Ed. at § 31-7(f).

The grand jury in Count One of the Superseding Indictment charged McFadden, Thompson, Brown and Germany with conspiracy to stage a series of automobile accidents "between March 2009 and July 2011" for the purpose of inducing various

automobile insurance carriers to make no-fault and liability claim payments based on bogus personal injury complaints. (Superseding Indictment ¶ 5.)  One such incident, consistent with the alleged scheme, occurred in the early evening hours of January 22, 2010 on 76th Street in Queens, New York.  (Gov't's Ex. 7A.)

The subject incident happened when — as reported to the police — an automobile registered to McFadden's mother and driven by Thompson was "rear-ended" by a vehicle rented from U-Haul and driven by government cooperator Daria Tang.  (Gov't's Ex. 7A; see also Jan. 28, 2015 Tr. at 109 (Roshon Cooke ["Cooke"] identifies the driver of the U-Haul vehicle as "Daria Tang," not Alisa Daria as listed in the "Driver Name" section of Gov't's Ex. 7A, the Police Accident Report.)

Cooke recruited Tang, (Jan. 28, 2015 Tr. at 109-11), while McFadden lined-up Thompson to drive his mother's 2004 Chrysler Pacifica, (id. at 119-20).  Brown and Daniel Osborne rode as passengers in the Chrysler while Germany was a passenger in the U-Haul vehicle.  (Id. at 120-21.)  As part of the recruitment process, the details of the scheme and their respective roles were, as mentioned earlier, explained to Brown, Thompson and Germany.  (Id. at 121-26.)

For their services in participating in the staged

accidents[20] on January 22, 2010 and then interacting with the on-board health care providers and lawyers, Thompson, Brown and Germany received personal injury settlement checks as previously detailed.

In sum, the government's proof as to the January 22nd episode, some portions of which are synopsized above – viewed through the appropriate prism, i.e. most favorably to the prosecution, United States v. Chavez, 549 F.3d 119, 124-25 (2d Cir. 2008), – far exceeds that necessary to survive the "multiple conspiracy" component of defendants' Rule 29 motion as to Count One; at a minimum, the government proved that the defendants conspired as to the accident on that date. And, as Ricardson instructs, even though that episode was but a "subset" of the charged wrongdoing that does not alter the result. Richardson, 532 F.3d at 1288-89.

                    ISSUE OF PREJUDICE CAUSED BY THE
                    CLAIMED VARIANCES BETWEEN THE
                    CONSPIRACY AND SUBSTANTIVE CHARGES
                    IN THE INDICTMENT ON THE ONE HAND AND
                    THE PROOF ADDUCED AT TRIAL ON THE OTHER

"[A] variance occurs when the charging terms of the

---

[20] Shortly before the rear-ending of the Chrysler Pacifica by the U-Haul vehicle on 76th Street, the two vehicles were intentionally caused to collide at another nearby location. However, McFadden deemed the resulting damage to be insufficient to support the notion that the vehicle occupants sustained physical injuries. Accordingly, the participants were directed to stage another collision involving more substantial contact. Jan. 28, 2015 Tr. at 148-55.

indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." United States v. Rigas, 490 F.3d 208, 226 (2d Cir. 2007)(internal quotation marks omitted).  For a variance to be of sufficient materiality to justify jettisoning a jury's verdict and replacing it with a judgment of acquittal, it must appear that there has been such "a variance [in proof] as to affect the substantial rights of the accused."  Berger v. United States, 295 U.S. 78, 82 (1935).

### 1.  Variances as to Count One

Defendants maintain that the trial proof was materially at odds with the allegations in the superceding indictment, not only as to the number of conspiracies established, but also, as earlier noted, via date and "content" variations regarding "the relevant conspiracy mailing."  (Germany's Mem. in Supp. at pp. 16-17.)

Proceeding in reverse order, the portion of defendants' variance "mailing" arguments as to Count One is predicated on the proposition that "the Court's conspiracy instruction required actual use of the mails" although mailing would not otherwise be an element of the crime.  (Germany's Post-Trial Sub. at p. 11.) But that proposition was earlier rejected, thus dictating a similar fate for the interdependent variance mailing argument.

Defendants' other basis for seeking vacatur of their

convictions under this Count is the multiple conspiracies issue discussed in part previously. The still-open prejudice prong of that argument will now be addressed.

Assuming, _arguendo_, that the evidence at trial established not only the charged conspiracy, or a subset thereof, but also other distinct agreements to defraud the listed insurance carriers, the question posed is whether the variances prejudiced any of the defendants to the extent of "den[ying]" him his right to a fair trial via the "spill-over effect [- i.e.] the transference of guilt from members of one conspiracy to members of another" — or otherwise. United States v. Bertolotti, 529 F.2d 149,156 (2d Cir. 1975).

The answer to the above question calls for a negative response. Initially it is noted that McFadden — as the ringmaster of the operation along with Cooke — was involved in all of the staged accidents. As such, the legitimacy of his claim of spill-over prejudice is at best problematic and is found by the Court to be without merit. See United States v. Adams, 316 Fed. Appx. 60 at 62-63 (2d Cir. 2009); United States v. Scott, 511 F.2d 15, 20 (8th Cir. 1975)("[i]f the defendant is a member of both conspiracies the danger of prejudice from this source [i.e., from "spill-over prejudice"] is minimal, if not non-existent."). McFadden has not advanced a persuasive argument to the contrary presumably because no such argument exists.

With respect to Thompson, Brown and Germany, the single versus multiple conspiracy variance — again, assuming its existence — has not been shown to have impermissibility compromised their respective rights to fair trial because:

a) all of the staged accidents involved the same straight forward modus operandi and essentially produced the same results, viz. minor damages to the vehicles employed and feigned, relatively minor injuries to the occupants.  Accordingly, no comparatively "inflammatory or shocking evidence" spilled over against Thompson, Brown or Germany from other incidents in which those defendants were not present and did not play an active role.  Adams, 316 Fed. Appx. at 62;

b) "There was no charge given pursuant to Pinkerton v. United States, 328 U.S. 640, 66 S. Ct. 1180, 90 L.Ed 1489 (1946), which allow[ed] one member of [the] conspiracy to be convicted for substantive offenses committed by another."  United States v. Alessi, 638 F.2d 466, 475 (2d Cir. 1980);

c) Not only was no Pinkerton charge given, but while each defendant was convicted of the substantive mail fraud count in which he was individually charged, each defendant was "acquitted [of] aiding

and abetting each other's substantive mail
frauds." (Gov't's May 31, 2005 Letter in Opp'n at
p. 1.) This result "indicates that [the jury]
gave each defendant the separate and individual
consideration of the evidence against him to which
he was entitled." Alessi, 638 F.2d at 475
(internal quotation marks omitted); and

d) "No [defendant] points to any prejudicial
testimony directed against him which was received
as a co-conspirator's declaration that would
otherwise constitute inadmissible hearsay. Fed.
R. Evid. 801(d)(2)(E)." Alessi, 638 F.2d at 475.

In sum, the prejudice element of defendants' "multiple
conspiracy" variance challenge to Count One has not been
established.

2. Defendants' Prejudice Claim Based
on Date and Content Variances as to
Substantive Counts of Conviction

a) Date Variance as to Each of the
Substantive Mail Fraud Counts

Each of the superseding indictment's substantive counts
charge that, "On or about the dates set forth below, . . . the
defendants . . . caused . . . mail matter to be delivered by the
United States Postal Service," followed by the approximate date
of the specific mailing, the name of the claimant and a
description of the item sent. (Superseding Indictment, ¶ 16.)

The dates of at least some, if not all, of the actual mailings as adduced at trial varied from the dates listed in the indictment, although only slightly.

With respect to dates, "[a] variance between the date alleged in the indictment and the date of the commission of the offense as shown by the evidence is generally not fatal." <u>United States v. Harmon</u>, 486 F.2d 363, 366 (10ᵗʰ Cir. 1973). And "[w]here 'on or about' language is used, the government is not required to prove the exact date, if a date reasonably near is established." <u>United States v. Nersesian</u>, 824 F.2d 1294, 1323 (2d Cir. 1987). None of the defendants has urged that he was somehow "mislead" or otherwise adversely effected via the de minimus difference between the two dates. <u>See</u> <u>United States v. LaSpina</u>, 299 F.3d 165, 183 (2d Cir. 2002).

Simply put, the date variances are immaterial, i.e. did not cause substantial prejudice to McFadden, Thompson, Brown or Germany as to their substantive mail fraud counts of conviction.

b)   <u>Content Variations</u>

The major content variation alleged by defendants is that the indictment charges one conspiracy whereas the proof supposedly established many. Since that issue has already been addressed, it will not be revisited in this portion of the opinion.

Another purported variance cited by defendants pertains

to Count Four.  In that Count, all defendants are charged with
mail fraud — McFadden as a principal and the others under 18
U.S.C. § 2 — with the content of the mailing being a no-fault
insurance application sent to RepWest.  "But [, defendants
contend], the government limited the superseding indictment's
conspiracy mailings to 'checks that represented payments for
personal injuries and medical treatment and services.'"
(Germany's Mem. in Supp. at p. 17, quoting paragraph 10 of the
Superseding Indictment.)  The legitimacy of both the "variance"
label and the "limit[ing]" language used by the defense appears
bogus when paragraph 10 is read in conjunction with paragraphs 8
and 16.  (Superseding Indictment ¶¶ 8, 10 and 16.)  In any event,
neither Thompson, Brown nor Germany claim that they were misled,
no less substantially prejudiced based on their readings of the
subject paragraphs.

        With respect to McFadden, his position on this point is
somewhat murky.  However, to the extent McFadden suggests he was
mislead, any claim of resulting prejudice is belied by (1) the
absence of a meaningful argument to that effect, and (2) it is
alleged he received a copy pretrial of the no-fault application
referenced in Count Four and he does not contend otherwise,[21]
thus precluding a claim of prejudicial surprise.  Cf. United

---

        [21]  See Germany's Post-Trial Reply Submission (DE 274) at p.
19.

States v. Kaplan, 490 F.3d 110, 129 (2d Cir. 2007).

CONCLUSION

For the reasons indicated, the items of relief sought by defendants are denied with one exception, to wit, Germany's venue—based argument targeting Count Five.  As to that Count, the dismissal sought is granted.

SO ORDERED.

Dated: October 27, 2015
       Central Islip, New York


                        ____/s/_____
                        DENIS R. HURLEY, U.S.D.J.